CINCINNATI BENGALS, INC., APPELLEE, *v.* CITY OF CINCINNATI ET AL., APPELLANTS.

(Nos. C-870794 and C-880177—
Decided January 11, 1989.)

*Taft, Stettinius & Hollister, Robert G. Stachler, W. Stuart Dornette* and *Mark J. Ruehlmann,* for appellee.

*Lindhorst & Dreidame* and *James L. O'Connell,* for appellant Cincinnati Reds.

*Richard A. Castellini,* city solicitor, *James F. McCarthy* and *John L. Hanselman, Jr.,* for appellant city of Cincinnati.

HILDEBRANDT, P.J. Defendants-appellants, the City of Cincinnati ("city") and the Cincinnati Reds ("Reds"), appeal from the judgment of the Hamilton County Court of Common Pleas entered October 19, 1987, in which the court granted certain relief as initially demanded by the plaintiffs-appellees, Cincinnati Bengals, Inc. ("Bengals"), under the first claim for relief of the original complaint and most recently set forth in the first claim for relief of the Bengals' second supplemental complaint, the filing of which was permitted by the court below on August 3, 1987. The substance of the relief granted by the trial court will be discussed hereafter.

The record discloses that on November 29, 1967, the city and the Bengals entered into a lease agreement under which the Bengals leased the city's Riverfront Stadium ("stadium") for the purpose of exhibiting football games. On December 4, 1978, the Bengals filed a complaint against the city in the court below, alleging that the city was guilty of certain breaches of the lease agreement. The myriad pleadings, affidavits, depositions, exhibits and entries that have postdated the Bengals' original complaint include the Bengals' amended complaint of May 3, 1982. That pleading sets forth fifteen claims for relief.[1]

On April 12, 1983, the city and the Bengals entered into a settlement agreement pursuant to which those parties compromised all but the Bengals' sixth claim for relief under the amended complaint. In that claim the Bengals alleged that the city had failed to comply with the lease provisions concerning the operation of the stadium's scoreboard and public-address system. Accordingly, an entry dismissing all but the sixth claim for relief, as well as all of the city's counterclaims, was placed of record on May 2, 1983.

On February 11, 1987, the Bengals filed a motion in the court below, seeking, *inter alia,* a temporary restraining order and a preliminary injunction enjoining the city from erecting a videoboard and additional advertising panels (hereafter collectively "videoboard") or issuing a building permit for such construction within the stadium. The motion was premised on the allegation that the construction of the videoboard would block the view of spectators, thereby constituting a

---

[1] The amended complaint was preceded by this court's decision in which the trial court's granting of the city's motion for summary judgment was reversed.

breach of the Bengals' lease with the city. On February 23, 1987, an entry was placed of record granting the Bengals' motion for a temporary restraining order.

On March 12 and 13, 1987, the trial court conducted evidentiary hearings on the Bengals' motion for a preliminary injunction during which the court also considered and granted the city's motion to add the Reds as a party defendant to the proceedings, which had been filed on March 12, 1987.[2] At the conclusion of the hearings the court announced from the bench that it was denying the Bengals' motion for preliminary injunction. The court specifically found, based upon the testimony, exhibits, and its personal view of the premises, "that the Bengals will not suffer irreparable injury or that the Bengals have no adequate remedy at law." Further, the court found that as a result of the construction of the videoboard, one hundred sixty red level (loge) stadium seats would be blocked. The court ordered the city to replace the one hundred sixty seats elsewhere in the stadium prior to the commencement of the Bengals' 1987 exhibition season. The court further ordered the city to prepare for the possible replacement of an additional two hundred fifty stadium seats to be accomplished prior to the commencement of the Bengals' 1987 season.

The court indicated that it would withhold a definite ruling on these additional seats until construction of the videoboard was accomplished and the court had personally inspected it.[3]

The Bengals next moved the court on March 23, 1987, to reconsider and enter a preliminary injunction. The basis for this motion was that subsequent to the court's action of March 13, 1987, the Reds removed the existing auxiliary scoreboard from what is described in the record as its original position behind home plate (baseball configuration) and installed two auxiliary scoreboards and advertising panels (hereafter collectively "new auxiliary scoreboards") directly across from one another.[4] In memoranda and affidavits in support of the motion to reconsider, the Bengals alleged that the new auxiliary scoreboards interfered with the view from one hundred ninety seven plaza-level seats and one hundred twenty club-level seats.

The court conducted a hearing on the motion for reconsideration on July 10, 1987. As a result of the evidence adduced at that hearing the court placed of record its entry of September 4, 1987, ordering, *inter alia:* (1) the denial of the Bengals' motion for a preliminary injunction prohibiting the Reds and the city from constructing the videoboard contingent upon the city installing five hundred sixty new seats, (2) the removal of the new auxiliary scoreboards at the conclusion of the 1987 baseball season, and (3) the

---

[2] The record discloses that in 1967 the city and the Reds entered into a lease agreement whereby the Reds agreed to lease the stadium from the city for the use of the Reds' baseball club. The record further shows that on October 24, 1977 the city agreed to transfer its right to operate the scoreboards and advertising panels to the Reds.

[3] There is no record of an entry reflecting the court's oral pronouncement of March 13, 1987. However, because the court's March 13, 1987 oral order is subsumed by a subsequent journalized final order from which the instant appeal is taken, the absence of a formalized journalization of that order is inconsequential.

[4] The new auxiliary scoreboards are described in the record as being mounted on the concrete facade between the plaza and club levels of the stadium. They are further described as extending from the ten-yard line to the ten-yard line on each side of the playing field (football configuration).

restoration of the original auxiliary scoreboard and clocks.

On July 9, 1987, the Bengals filed a motion for leave to file a second supplemental complaint which substantially restated the allegations set forth in the motion for reconsideration. The court below granted such leave on August 3, 1987. Thereafter, the Reds and the city each moved the court to set those matters pertaining to the videoboard, scoreboards and advertising panels for a hearing on the merits. The court granted those motions on October 13, 1987, thereby generating the merit hearings of October 13 and 14, 1987.

At the conclusion of the merit hearings the court entered a final judgment, journalized on October 19, 1987, which substantially reflected the court's ruling of September 4, 1987. This entry also included a Civ. R. 54(B) certification as other matters remained pending before the court. From that judgment the Reds and the city bring this timely appeal in which the city advances one assignment of error and the Reds assert two assignments.[5]

In the city's sole assignment of error and the Reds' first assignment of error, it is urged that the trial court erred to the prejudice of each when it ordered the city to install five hundred sixty new permanent seats in the stadium and by ordering the Reds to remove the new auxiliary scoreboards. We are unpersuaded.

We begin our analysis of this assignment of error by reminding the reader that the order concerning the installation of five hundred sixty additional seats on the field level of the stadium was generated by the installation of the videoboard on the loge level of the stadium. There is substantial evidence in the record that, as a result of the installation of the videoboard, the view from certain seats in that section of the stadium was either totally or partially blocked, in contravention of the 1967 lease between the Bengals and the city. Likewise, there is evidence in the record that the new auxiliary scoreboards diminished the view from certain seats on the plaza and club levels on each side of the stadium between the ten-yard lines for football.

The pertinent sections of the lease are set forth below:

"*Section 407.* All revenues from the sale of advertising rights as to any of the walls, fences, facades, score boards of other walls or appurtenances on the Demised Premises or on the Stadium Complex, except as provided expressly to the contrary in this lease, shall belong to and may be retained exclusively by the LANDLORD.

"However, the LANDLORD shall not cause such advertising matter to be displayed in such manner as to interfere with spectators' view or to interfere with the use of the Playing Field of the Stadium and insofar as possible, LANDLORD shall cause such advertising matter to be displayed so as to minimize its exposure to television cameras."

"*Section 1409.* As to Exclusive Demised Premises after TENANT shall initially cause the same to be furnished and equipped for TENANT'S

---

[5] The Reds' first assignment of error pertains to the trial court's order of October 19, 1987, resulting in their joint notice of appeal with the city and to which we have assigned this court's case number C-870794. The Reds' second assignment of error is the result of their notice of appeal from the trial court's March 4, 1988 entry in which the court granted the Bengals' motion for summary judgment on the Reds' counterclaim and to which we have assigned this court's case number C-880177. On March 31, 1988 this court consolidated the two appeals for briefing, argument and decision.

purposes and TENANT'S use thereof, TENANT may not thereafter make any substantial change therein without the prior written consent of LANDLORD and, if required by LANDLORD, TENANT shall furnish adequate plans and specifications showing the change proposed to be made by TENANT.

"After the completion of the improvements called for by the finally approved Plans and Specifications, LANDLORD shall not make any substantial change therein without TENANT'S prior written consent and, if required by TENANT, LANDLORD shall furnish adequate plans and specifications showing the changes proposed to be made by LANDLORD."

"*Section 1411.* The LANDLORD covenants with the TENANT that on payment by TENANT of the rents reserved herein, the payment by TENANT of other sums in the nature of rent reserved herein, the payment by TENANT of all other sums payable from time to time by the TENANT hereunder and the performance of and compliance by TENANT with all covenants, agreements, conditions and obligations herein contained on the part of TENANT to be paid and performed and complied with, TENANT may quietly enjoy the Demised Premises without hindrance by LANDLORD or by any person or entity claiming by, from, through or under LANDLORD, while this lease continues in effect."

Addressing first that part of the court's order requiring the city to install five hundred sixty new seats, we observe that the record transmitted to us for our review includes six hundred eighty-three pages of transcript that accumulated during the period of February 1987 through October 1987, myriad depositions, affidavits and exhibits, all of which were considered by the court prior to reaching its deter-

mination on the merits. Additionally, the trial judge personally viewed the stadium, with as well as without counsel, without objection.

There is evidence from the city's stadium manager, Glenn Redmer ("Redmer"), that the videoboard and adjacent advertising panels completely blocked the view of one hundred eighteen stadium seats, and partially blocked the view of forty-two other seats. Redmer further noted that the videoboard's components are protected by an air-conditioning system which creates noise and heat which affect a greater number of seats. Redmer testified that he planned to rectify the blocked seats by adding one hundred sixty seats in the alternative aisles of the field-level seats and that by this procedure Redmer could create a total of five hundred sixty new field-level seats.

The Bengals presented evidence that the videoboard, including the adjacent advertising panels, interfered with the view of six hundred ninety-one loge seats, including twenty-three allegedly affected by the air-conditioning fans and noise.

From our review of the record concerning this issue, we conclude that the action of the city and the Reds, at a minimum, violated Sections 407, 1409 and 1411 of the Bengals' lease with the city. While the parties hereto disagree as to the actual number of seats affected by the videoboard, it is uncontroverted that the view from at least one hundred sixty loge seats is partially or totally blocked.

It is evident that the court below painstakingly considered all the exhibits, affidavits, diagrams and testimony. Further, the court visited the stadium on five different occasions. Considering this prodigious effort, we find that the court's judgment concerning the five hundred sixty new seats is supported by some competent, credible

evidence and cannot, therefore, be disturbed. See *C. E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578, syllabus.

Additionally, as the trial judge observed below, we fail to see how the parties are prejudiced by the creation of additional seats within the stadium, even if the trial court's order mandates a number of seats greater than that actually lost to the videoboard.

We now turn to that part of the judgment that pertains to the removal of the new auxiliary scoreboards.

At first glance, this order appears to be a rather harsh (and expensive) remedy. However, from reviewing the record we conclude that this order is also supported by some competent, credible evidence. See *C. E. Morris Co.* v. *Foley Constr. Co., supra.*

The merit testimony pertaining to those seats, the view from which is adversely affected by the new auxiliary scoreboards, concerns rows 13, 14 and 15 of the plaza level. In reaching our decision we acknowledge and reject, for the reasons stated hereafter, the Reds' argument that rows 14 and 15 are not a permanent part of the stadium, and therefore that the removal of the new auxiliary scoreboards should not have been predicated upon any alleged diminished visibility from those seats.[6]

The city offered expert testimony from Thomas Strohmaier. Through the exhibits he prepared, both the Reds and the city sought to establish that any decrease in visibility from these seats was "de minimus." During cross-examination the following took place between Strohmaier and counsel for the Bengals:

"Q. Do the advertising billboards attached to the auxiliary score boards interfere with the ability of spectators in that football field to see portions of the game?

"A. In Row 15, standing position, minor obstruction. In the others, you already have my opinion and I've already answered that. Open field of vision, some interference. Concentrated field of vision of activity on that football field, there is no interference."

As noted above, the trial judge viewed the stadium on five occasions. Two of those occasions were during actual football games. At the conclusion of the merit hearings, the trial judge explained his reasons for, *inter alia,* ordering the removal of the new auxiliary scoreboards:

"Regarding the auxiliary score boards and the advertising billboards that are attached to the facade, and we all know what we're talking about, I take note of the fact that we had expert testimony here and I take note of the fact that there are people that disagree with my view about how well you can see from that area and that's exactly why I went down there and that's exactly why I'm putting this into the record so the Court of Appeals judges will be able to read and understand what I did and why I did it. I still think, notwithstanding all the testimony, I'm not persuaded that the auxiliary score board and the advertising panels have a dominimus [*sic*] effect, as was used during Mr. O'Connell's closing argument. I believe that they, in fact, interfere with the view of the spectators. I think it's a real and a certain and a substantial and a direct impairment of spectators' views from those seats and most of the testimony

---

[6] Row 13 is the last permanent row of plaza level seats. Rows 14 and 15 consist of folding chairs that have been placed upon risers that are 8 inches and 16 inches in height, respectively.

that I heard had to do with the view from the orange seats. That is row[s] 13, 14 and 15.

"I don't know if I told you this during our previous meetings here, I think it not only interferes with rows 13, 14 and 15, but I think it also interferes with the view from some of the permanent green seats directly in front. I assume that's rows 12 and 11. And we talk about, the parties have talked about, at least the defendants have talked about the fact that these new panels only extend down six inches farther than the old ones did, but we've all got to keep in mind, I don't think it was clearly brought out, that as best as I can tell, you've probably got three to four times as much overhang from that facade now than you ever had before and you're not talking about six inches, because you're talking about 18 inches because it hangs down now in places where it never did before.

"So I'm unpersuaded as to the argument that I've heard and the evidence I've seen the last two days regarding the auxiliaries and I'm going to follow through and continue with the order that I previously put on. I'm going to order that the auxiliary score boards and the adjacent advertising billboards which extend below the facade, between the plaza and club levels, be removed and that I'm going to further order that the auxiliary score board, I'm speaking only of the auxiliary score board, be returned to its original position on the facade behind home plate. And I'm not, I'm not blind and I haven't closed my ears to the fact that this kind of move will cost the parties more money to do it, but the fact is, and I agree with the Bengals on this, I agree that the Bengals couldn't have complained any more often than they did or any louder than they did about this and I believe that the City, although the City sent letters to the Reds, I think those let-ters were nothing more than a pleasant reminder or maybe an unpleasant reminder to the Reds that they should be watching out for the interests of the Bengals and the Bengals' lease with the City.

"Notwithstanding that, the Reds, knowing all this, went ahead, and I understand their interest in having a new score board and new advertising panels, but knowing of the possibility this might happen, nevertheless, they went ahead and I think the Reds, under those circumstances, should be prepared to bear the costs and the responsibility for what they've done."

As can be seen, regardless of whether the effect of the new auxiliary scoreboards upon the spectator's view is "de minimus," the court and the appellants' expert at least concur that the scoreboards have *some* effect.

In light of the foregoing discussion, the position taken by the Reds through Donald Breen, Jr., vice president for business and management, is worthy of analysis. At page two of Breen's affidavit, he states in part:

"Affiant further says that at no time had the Cincinnati Reds ever represented to anyone, including the City of Cincinnati and the Cincinnati Bengals, that the vertical dimension of the aforesaid auxiliary scoreboards and adjacent advertising panels would be other than 4 feet, 6 inches; and that, to the knowledge of the affiant, no representation was ever made to the City of Cincinnati or the Cincinnati Bengals that either the auxiliary scoreboards or the adjacent advertising panels would not hang down, to some extent, below the level of the tier of the stadium to which they are affixed, the only representation in that regard being that the auxiliary scoreboards and adjacent advertising panels would not impede, or interfere with, the view of play afforded to persons sitting in seats behind or under the

auxiliary scoreboards and adjacent advertising panels, it continuing to be the position of the Cincinnati Reds that any such representation remains entirely accurate and correct. * * *"

Breen maintained that position during the merit hearings.

Another pertinent point was raised by counsel for the Bengals during Breen's cross-examination when counsel referred him to his earlier testimony during the March 12, 1987 hearing on the Bengals' motion for preliminary injunction. During the March 12, 1987 hearing, Breen testified in pertinent part:

"Q. [By an assistant city solicitor]: Mr. Breen, you've indicated to the court that there are additional ad panels and tri-vision panels that are to be built in conjunction with this new scoreboard. This court has granted the Cincinnati [*sic*], this court has modified its temporary restraining order allowing for modification of the existing matrix board and also the installation of two new auxiliary boards. Do the Reds intend to pursue any upgrading of the existing scoreboards?

"A. No, not at this time.

"Q. Do the Reds intend to install new auxiliary boards?

"A. No, not at this time.

"Q. Why not?

"A. Well, this isn't a piecemeal project. First of all, it's a very expensive thing to install those new auxiliary boards and to rebuild the main scoreboard. You're talking two and a half million dollars or so. And this was to be paid for, the construction of the board and the auxiliary boards, was to be paid for from revenues from the additional signage we will put up alongside the board up there. If we don't have those revenues, it proves to be a very costly exercise for us.

"There's some technical reasons also that basically relate to power and structural construction. For example, if we went ahead with this project, if we're going to have a color videoboard, we need to run twice the power up there that we would need for the new scoreboard. If we're going to have a color videoboard, we need to fortify the construction of the steel overhangs. There's some work that needs to be done. The board, some internal things need to be done to the inside of the matrix board to support that color videoboard.

"All of this is extremely expensive, very, very expensive, and also we're being offered some favorable incentives as being one of the first stadiums in the country to have a zone videoboard installed.

"If we were to do this project this year, we were being offered some incentives in terms of financing and rebates, if you will, that would not be available to us otherwise. So, generally looking at it as being a business decision, doing this piecemeal and finding out we weren't going to go ahead with the rest of the project or we weren't going to get the revenue of the signage would turn what was a pretty good business decision into a bad one * * *."

Breen's testimony notwithstanding, installation of the new auxiliary scoreboards commenced on May 20, 1987.[7]

---

[7] At the merit hearing Breen's response to counsel's inquiry concerning Breen's earlier testimony was:

"A. That can't be correct because the installation had already begun. Orders had already been placed."

"A. I can see it, I'm telling you if that was auxiliary I must not have understood the question because the order for the auxiliary board was placed back in January and it never changed."

"A. Maybe what I could have, I don't

The Reds argue that the Bengals cannot premise the removal of the new auxiliary scoreboards upon any interference with the view from rows 14 and 15, plaza level, because those seats are not permanent. While the Reds acknowledge that they have used those seats on a few occasions for baseball games, they maintain that rows 14 and 15 constitute a substantial change to the stadium in violation of Section 1409 of the Bengals' lease which is set forth herein.

The Reds' argument is feckless in light of the aforementioned April 12, 1983 settlement agreement between the Bengals and the city. Section 411 of that document provides:

"*Section 411.* Prior to each TENANT'S home football game at the Stadium, LANDLORD shall, at its expense, erect 2,532 temporary seats and risers behind the last row of permanent seats on the blue field level, on the green plaza level, and on the yellow club level. LANDLORD shall be responsible for the repair, maintenance, and, when necessary, the replacement of the chairs and risers."

After reviewing this most cumbersome record and taking into consideration those matters for determination that are within the province of the trial court, sitting as trier of fact, we cannot say that the court's judgment concerning the new auxillary scoreboards is against the manifest weight of the evidence.

A football game consists of running, passing and kicking plays. There is evidence that those fans that occupy rows 13, 14 and 15 do not have a substantial impairment of their view of running plays. However, there is also evidence to the contrary concerning passing and kicking plays. Additionally, the trial judge observed that, in his opinion, the view from seats other than those in the aforementioned three rows is adversely affected by the new auxiliary scoreboards. We therefore overrule the city's sole assignment of error and the Reds' first assignment of error.

For the second assignment of error the Reds assert that the trial court erred when it issued its March 4, 1988 order dismissing the Reds' counterclaim against the Bengals. We do not agree.

On November 12, 1987, the Reds filed an answer to the Bengals' second supplemental complaint. The answer included the Reds' counterclaim against the Bengals alleging, *inter alia:* (1) the Reds were damaged as a result of certain interference caused by the temporary rows 14 and 15 which were allegedly constructed in violation of the Bengals' lease with the city; (2) the Bengals tortiously interfered with the Reds' lease with the city; and (3) the Bengals tortiously interfered with a supplemental settlement agreement dated May 2, 1985, between the Reds and the city.

On January 6, 1988, the Bengals filed a motion for summary judgment on this counterclaim which the court granted on March 4, 1988.[8]

The Reds argue in support of this assignment that the trial court lost jurisdiction over the matter *sub judice* due to the fact that the Reds' and the city's notice of appeal from the trial court's judgment of October 19, 1987, was filed on November 6, 1987. This

---

know what the surrounding testimony was, but was it, it could have been something to the effect if the Reds, have they installed it or something like that at that time. You know the boards had not been suspended at that point in time, but they'd certainly be ordered and were under construction."

[8] The court's entry contains a certification in compliance with Civ. R. 54(B).

contention fails as we perceive the matter asserted in the Reds' counterclaim, from which appeal No. C-880177 is taken, to be collateral to the issues raised under appeal No. C-870794. This court's ability to decide the propriety of the trial court's judgment ordering the city to install five hundred sixty new seats and ordering the Reds to remove the new auxiliary scoreboards and to replace the original is not affected by whatever ruling the trial court made concerning alleged damages and interference to the Reds by the Bengals' utilization of the temporary seating. We note in passing that had we agreed with the Reds that the temporary seats could not be a basis for the removal of the new auxiliary scoreboards, such ruling could be a reason for reversal of the trial court's granting of summary judgment as to the Reds' counterclaim for damages caused by those seats. However, our authority to review the issue of the earlier appeal would not be diminished. See *Newman* v. *Al Castrucci Ford Sales, Inc.* (Oct. 12, 1988), Hamilton App. Nos. C-870361 and C-870796, unreported.

Furthermore, as we have observed during our disposition of appeal No. C-870794, Section 411 of the April 12, 1983 settlement agreement between the city and the Bengals requires the city to furnish the temporary seating of which the Reds complain in their counterclaim. Therefore, if the Reds have a cause of action stemming from alleged interference with their rights to the use of the stadium, it would appear that such cause of action would be against the city rather than against the Bengals. For the reasons set forth above, we overrule the Reds' second assignment of error.

The trial court's judgments are affirmed.

*Judgments affirmed.*

KLUSMEIER and UTZ, JJ., concur.